J-S29034-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: H.H.-N.C., MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.J.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 188 EDA 2018 |

Appeal from the Order Entered December 6, 2017
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2017-A-0127

| | | |
|---|---|---|
| IN RE:  ADOPTION OF R.A.H.W., MINOR CHILD | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.J.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 189 EDA 2018 |

Appeal from the Order Entered December 6, 2017
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2017-A-0128

| | | |
|---|---|---|
| IN RE: ADOPTION OF: A.J.R.W. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: D.J.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 190 EDA 2018 |

Appeal from the Order Entered December 6, 2017
In the Court of Common Pleas of Montgomery County Orphans' Court at
No(s):  2017-A-0129

BEFORE:   PANELLA, J., MURRAY, J., and STEVENS*, P.J.E.

_____
*   Former Justice specially assigned to the Superior Court.

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED JUNE 29, 2018**

Appellant, D.J.W. ("Father"), files this appeal from the orders dated December 1, 2017, and entered December 6, 2017,[1] in the Montgomery County Court of Common Pleas, granting the petition of the Montgomery County Office of Children and Youth ("OCY" or the "Agency") and involuntarily terminating his parental rights to his minor, dependent sons, H.H.-N.C., born in January 2009, R.A.H.W., born in April 2016, and A.J.R.W., born in March 2014 (collectively, the "Children"), pursuant to the Adoption Act, 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b).[2]  After review, we affirm the trial court's orders.

The record reveals the following relevant facts and procedural history:

---

[1] The subject orders were dated December 1, 2017.  However, the clerk did not provide notice pursuant to Pa.R.C.P. 236(b) until December 6, 2017.  Our appellate rules designate the date of entry of an order as "the day on which the clerk makes the notation in the docket that notice of entry of the order has been given as required by Pa.R.C.P. 236(b)."  Pa.R.A.P. 108(b).  Further, our Supreme Court has held that "an order is not appealable until it is entered on the docket with the required notation that appropriate notice has been given."  ***Frazier v. City of Philadelphia***, 557 Pa. 618, 621, 735 A.2d 113, 115 (1999).

[2] By separate order entered the same date, the trial court involuntarily terminated the parental rights of the Children's mother, E.A.W. a/k/a E.A.C.-W. a/k/a E.A.W.-C. ("Mother").  Mother has not filed an appeal, and she is not a party to the instant appeal.

- 2 -

This family originally became known to OCY on September 3, 2015, as a result of a referral for the Children's older sister for ungovernable services.[3] H.H.-N.C. and A.J.R.W. were adjudicated dependent and taken into OCY custody on February 23, 2016, due to issues of housing, lack of supervision, and unemployment. In addition, Mother was pregnant and going to a methadone clinic. H.H.-N.C. and A.J.R.W. were returned to Mother on April 26, 2016, subsequent to the birth of R.A.H.W.

Thereafter, on May 6, 2016, Father found the Children home alone. Father took the Children to a family member and contacted OCY on May 9, 2016. H.H.-N.C. and A.J.R.W. were taken again into custody on May 9, 2016. R.A.H.W. was taken into custody two days later, on May 11, 2016, when located by the police.[4] N.T., 11/17/17, at 104-06. At the time, H.H.-N.C. and A.J.R.W. were not up-to-date medically, and there were truancy issues with regard to H.H.-N.C. *Id.* at 135-36. Critically, as related by an OCY

---

[3] OCY defines an ungovernable child as "an adolescent between the ages of 10 and 18 who has committed a specific act or acts of habitual disobedience of the reasonable and lawful commands of his/her parent, guardian or custodian," such as: curfew violations, drug/alcohol involvement, running away, gang involvement, verbal abuse, and sexual promiscuity. https://www.montcopa.org/2885/Adolescent_Ungovernable-Services.

[4] After Father dropped the Children off, Mother came and took R.A.H.W., and their whereabouts were unknown. N.T., 11/17/17, at 104-06. R.A.H.W. was adjudicated dependent thereafter on May 24, 2016. Order of Adjudication and Disposition-Child Dependent, 5/24/16.

caseworker, Jeanette Vazquez, Father was not considered a resource and acknowledged that he was unable and not in a position to care for the Children at the time. *Id.* at 150, 152-53.

OCY filed petitions to terminate Father's parental rights on July 28, 2017. The trial court held hearings on November 17, 2017, and December 1, 2017.[5] In support thereof, OCY presented the testimony of Robert Gaskill, OCY family reunification specialist; Samuel Paul, Montgomery County Adult Probation Officer; Naomi Watson, JusticeWorks YouthCare family research specialist; J.S.M., foster father; Nicole Hirschman, Salvation Army Children Services foster care caseworker; Jeanette Vazquez, OCY caseworker; and Cathy Milliman, OCY adoption caseworker. OCY further offered Exhibits 1 through 17, which were admitted without objection. N.T., 11/17/17, at 108-10, 116, 127-28, 171-72. Father was present and represented by counsel, but did not testify on his own behalf or present any evidence.[6] In addition, during this proceeding, the Children were represented by counsel, who participated in the questioning.[7]

_____

[5] The December 1, 2017, listing was for the court to place its decision on the record. N.T., 12/1/17, at 3.

[6] OCY additionally filed petitions to involuntarily terminate Mother's parental rights. Mother was not present at the hearings, but she was represented by counsel.

[7] Counsel for the Children, Arona Gur, Esquire, argued in favor of termination of Father's parental rights at the close of the hearing. N.T., 11/17/17, at 178-79. Upon review, as best we can discern, it appears that Ms. Gur was

- 4 -

By orders dated December 1, 2017, and entered December 6, 2017, the trial court involuntarily terminated the parental rights of Father to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b).[8] On December 29, 2017, Father, through appointed counsel, filed notices of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b), which this Court consolidated *sua sponte* on February 5, 2017. The trial court issued a Rule 1925(a) Opinion on January 23, 2018,

---

appointed to represent the Children as counsel. It is unclear if she was also serving and/or served as Guardian *ad litem* ("GAL").

This Court has recently held that we will address *sua sponte* the failure of an orphans' court to appoint counsel pursuant to 23 Pa.C.S.A. § 2313(a). **See In re K.J.H.**, 2018 PA Super 37 *2 (Pa.Super. filed February 20, 2018). Our Supreme Court, in **In re Adoption of L.B.M.**, 639 Pa. 428, 161 A.3d 172 (2017) (plurality), held that Section 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The court defined a child's legal interest as synonymous with his or her preferred outcome. With respect to this Court's holding in **In re K.M.**, 53 A.3d 781 (Pa.Super. 2012), that a GAL who is an attorney may act as counsel pursuant to Section 2313(a) so long as the dual roles do not create a conflict between the child's best interest and legal interest, the **L.B.M.** Court did not overrule it.

Our review of the record reveals that there is no conflict between the Children's legal and best interests. We observe that, at the time of the hearing, the two younger children were only one and a half and three years old. The oldest child, while eight years old, expressed excitement at the idea of being adopted. Therefore, we do not remand this matter. **Cf. In re T.M.L.M.**, 2018 PA Super 87 (filed April 13, 2018) (remand for further proceedings when six-year-old child's preference was equivocal and the attorney neglected to interview the child to determine whether legal and best interests were in conflict).

[8] These orders memorialized the decision placed by the court on the record. N.T., 12/1/17, at 21.

- 5 -

noting that the rationale for the orders was contained in the Notes of Testimony, the relevant pages of which were attached.

On appeal, Father raises the following issue for our review:

1.      Did the trial court abuse its discretion by finding there was competent[] evidence to terminate Birth Father's rights?

Father's Brief at 7.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, [616 Pa. 309, 325, 47 A.3d 817, 826 (2012)]. "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at [325-26, 47 A.3d at] 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, [608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010)].

*In re T.S.M.*, 620 Pa. 602, 628, 71 A.3d 251, 267 (2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even

if the record could also support the opposite result." ***In re Adoption of T.B.B.,*** 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S.A. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

***In re L.M.***, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quotation omitted).

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en*

*banc*). Here, we analyze the court's termination orders pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the

- 8 -

causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. . . . [A] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re A.L.D.*, 797 A.2d at 340 (internal quotation marks and citations omitted).

In *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817 (2012), our Supreme Court, in addressing Section 2511(a)(2), concluded the following:

> [I]ncarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Id.* at 328-29, 47 A.3d at 828. *See In re D.C.D.*, 629 Pa. 325, 346-47, 105 A.3d 662, 675 (2014) (holding that incarceration prior to the child's birth and until the child was at least age seven renders family reunification an unrealistic goal and the court was within its discretion to terminate parental rights

"notwithstanding the agency's failure" to follow court's initial directive that reunification efforts be made). The Court in **S.P.** further stated:

> [W]e now definitively hold that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S.[A.] § 2511(a)(2). **See e.g. Adoption of J.J.,** [511 Pa. 590, 605,] 515 A.2d [883, 891 (1986)] ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties."); [**In re**] **E.A.P.,** 944 A.2d [79, 85 (Pa.Super. 2008)](holding termination under § 2511(a)(2) was supported by mother's repeated incarcerations and failure to be present for child, which caused child to be without essential care and subsistence for most of her life and which cannot be remedied despite mother's compliance with various prison programs).

**In re Adoption of S.P.**, 616 Pa. at 331-32, 47 A.3d at 830 (footnote omitted).

In the case at bar, the trial court indicated as follows with regard to Father:

> I will now address my findings related to birth father. The children at issue here were placed in OCY care in May of 2016 due to birth father's report that the boys were left home alone. Since that time, birth father has not made himself available as a resource to care for his sons. In response to specific concerns regarding birth father's stable, adequate housing, birth father refused to credibly tell the OCY caseworker where he lived or worked. Birth father never completed his family service plan goals. In addition to lacking housing, he provided no proof of employment and missed [c]ourt hearings.
>
> OCY assigned birth father a JusticeWorks family reunification specialist on June 21, 2016. Because birth father

was uncooperative, the case was closed on August 31, 2016, due to no contact. Birth father also failed to respond to birth mother's specialist's attempts to contact him. Birth father's contact with his OCY case worker was inconsistent.

Although incarcerated for 30 days in March of 2016, birth father attended eight of 31 supervised visits made available to him from March 1st, 2016[,] to October 10, 2017. And those numbers come from OCY Exhibit 17. Supervised visits were biweekly. During his initial visits in Pottstown, birth father's behavior was appropriate. Visits were then moved to Allentown near the foster family. At these visits, birth father would openly complain about the foster parents in front of the boys. His attention to his children at the visits was inconsistent. Birth father's last visit with his sons was in July 2017 at a court hearing. His last visit outside of a courtroom setting occurred in June of 2017. Birth father never followed up on offers for more visits with his sons.

When the boys were initially placed with the foster parents, between March and April 2017, birth father made four brief unscheduled phone calls to his sons. His inappropriate discussions with the oldest son, [H.H.-N.C.], resulted in behavioral problems that only subsided when the calls stopped. Due to the behavior problems, the foster parents requested scheduled phone calls. After this request, birth father called his sons twice over the course of a month, then discontinued the calls.

Against the advice of caregiver agency officials and medical personnel, birth father refused to grant authority for two of his sons to have surgery essential for their development. Birth father failed to investigate the need for this surgery on his own. Only in the presence of the [c]ourt and his counsel did birth father concede. In accordance with OCY Exhibit Number 10, between the time period of May 8, 2017[,] and August 15, 2017, birth father complied with only one of the five OCY random requests for urine samples. That one sample, the first requested, provided negative results.

Because he is on probation for two drug-related criminal convictions, birth father was also subject to requests for urine by the Adult Probation Department. On October 10, 2017, birth father tested positive for numerous drugs, including cocaine and amphetamines. Nearly one week later, birth father tested positive for THC and oxycontin. Birth father was incarcerated for violating

the terms of his probation on October 16, 2017, and he currently remains in County Prison.

Each child has special needs. Birth father consistently disparaged foster parents for failing to address his sons' needs, yet, he is not available to care for the boys, and he failed to cooperate with OCY in addressing the needs of his children.

The oldest child, [H.H.-N.C.], feels loyalty to birth father and misses birth mother. The younger children do not have a significant connection to birth parents. The boys are comfortable and affectionate with their foster parents and their children, calling the foster parents "mom" and "dad."

N.T., 12/1/17, at 10-14.

Further, in finding grounds for termination pursuant to Section 2511(a)(2), the trial court reasoned as follows:

I will now discuss related factors to my findings, including incarceration, drug use, incapacity and parent mental disability and incapacity. The Supreme Court of Pennsylvania has held that it is not a violation of Constitutional Rights for an individual's parental rights to be terminated due to the parents' mental disabilities or handicaps that prevent the parents from being able to provide proper care for the child. That is from the 1978 case, [*In re: William L.*], cited at 383 [A.2d] 1228. As the Supreme Court explained in reaching its decision, a decision to terminate parental rights [*sic*] never to be made lightly or without a sense of compassion for a parent can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform. Again, that was cited from the aforementioned case, [*In Re: William L*.], specifically at page 1239.

The Pennsylvania Supreme Court has also held that a mental impairment or disability doesn't require OCY to meet additional burdens or hold OCY to a higher standard in order to justify [the] [c]ourt's termination of a parent's rights to her child. That is from the 1986 case, [*In Re: Adoption of J.J.*], cited at 515 Atlantic 2d, 883.

There is a duty placed on the parents to work with OCY and receive services in order to learn the necessary parenting skills. That sentiment comes expressly from the aforementioned case of, [*In Re: J.J.*], but also from the case, [*In Re: the Adoption of M.E.P.*], cited at 825 [A.2d] 1266, a 2003 Pennsylvania Superior Court case.

These two cases emphasize that a parent who is under OCY supervision has an affirmative duty to do something in support of their ability to parent. That act of doing something includes cooperating and working with the services provided by OCY. My findings indicate the birth parents failed to cooperate with OCY or use the resources provided. Despite a parent's wishes and desires to preserve a parental bond or role in the cases where the parent is incapable of providing even basic necessities and will continue to suffer such parental incapacity, the focus of the [c]ourt must not be on the parent's wishes and desires, but the child's need for safety, security, permanency and well-being. The child's safety is this [c]ourt's paramount concern.

I will now address the issue of parental drug use.

This [c]ourt heard credible evidence of drug use by both parents. A review of OCY exhibits shows both parents failed to participate in random urinalysis testing. This evidence was supplemented with credible testimony regarding the birth parents' refusal to respond to requests for testing. Given the lack of evidence regarding the birth parents' attempts at sobriety or rehabilitation and the length of time that the children have been in foster care, OCY has demonstrated that the conditions that led to the removal of the children from the home cannot or will not be remedied within a reasonable time.

I will next address incarceration. The Pennsylvania Supreme Court has on several occasions considered the relevance of incarceration of a parent for termination of parental rights under Sections 2511 (a)(1) and (a)(2) of the Adoption Act.

In its plurality decision of, [*In Re: R.I.S.*], cited at 36 [A.3d] 574, the Pennsylvania Supreme Court stated that the incarceration of a parent standing alone cannot constitute proper grounds for terminating that parent's rights to his child. But in the concurring opinion the Court made clear that incarceration can be a factor in a trial court's decision to terminate parental rights.

- 13 -

Thereafter, in the case, [**In Re: Adoption of S.P.**], indexed at 47 [A.3d] 828, the Pennsylvania Supreme Court held "that incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing essential parental care, control or subsistence."

N.T., 12/1/17, at 14-17.

Father, however, argues that the Children resided with Mother.[9]  He maintains that he visited with the Children and that his home was assessed as "very clean, very orderly, very organized" and without safety concerns. Father's Brief at 10.  We disagree.

A review of the record supports the trial court's finding of grounds for termination under Section 2511(a)(2).  The record reveals that Father failed to comply with his Family Service Plan ("FSP") goals aimed at reunification with the Children.  He further failed to alleviate any of the concerns related to his ability and capacity to care for and parent the Children.  As we discern no abuse of discretion or error of law, we do not disturb the trial court's findings.

OCY caseworker, Jeanette Vazquez, recounted Father's FSP objectives as:  to cooperate with OCY, provide employment verification, provide proof of appropriate housing, and maintain constant visitation and contact with his children.  N.T., 11/17/17, at 119-20.  Ms. Vazquez testified that Father did not successfully complete these objectives.  **Id.** at 120.  She described Father's compliance as "minimal."  **Id.** at 124.  She likewise indicated a lack of improvement and that his overall progress toward reunification was

_____

[9] In the summary of argument section of his brief, Father suggests that, as the Children were not residing with him, he was not the cause for their removal and commitment and/or placement.  Father's Brief at 9.

"minim[al]." *Id.* at 126, 150-51. When asked about Father's attitude throughout the case, Ms. Vazquez responded, "We have been able to communicate. We can have a civil conversation, but there is a lot of placing blame on me and the [A]gency for everything that is going on. Father has not taken responsibility whenever I try to address things, any issues that arise." *Id.* at 124. Ms. Vazquez reported that Father had not maintained consistent contact with OCY; had not presented proof of employment; missed court hearings; and was not compliant with requests for drug screens. *Id.* at 124-27. As a result of Father's failure to comply with drug screens, Ms. Vazquez was unable to speak to Father's sobriety. *Id.* at 128.

Further, Father's visitation with the Children never progressed to unsupervised and was characterized by Ms. Vazquez as not consistent. *Id.* at 127-28. While he last saw the Children in court on July 24, 2017, his last visit outside of court was on June 13, 2017. *Id.* at 89-90, 151. Notably, Father's attentiveness during these visits was explained by Nicole Hirschman, Salvation Army Children Services foster care caseworker, who supervised visitation between Father and the Children from March to June 2017, as "off and on." *Id.* at 87. Further, Ms. Hirschman testified, "I can tell he loves and cares for them. However, the visits appear to me to be sessions to complain to me about the foster parents or how the children look." *Id.* Additionally, Ms. Vazquez did not have proof of adequate housing. Ms. Vazquez testified that she was never able to assess the initial address provided by Father. *Id.* at 120. While the next address was found to be an appropriate residence, Ms.

Vazquez stated that Father advised that he was no longer living there and provided no updated address. *Id.* at 122.

Father further failed to comply with services aimed at reunification and assistance toward his objectives. Father failed to cooperate with the OCY family research specialist,[10] as well as the JusticeWorks YouthCare family research specialist.[11] *Id.* at 10, 12, 37, 39.

Lastly, at the time of the hearing, Father was incarcerated for violating his probation stemming from charges related to possession with intent to deliver.[12] *Id.* at 21-22, 122-23. Father's probation officer, Samuel Paul, testified that his compliance with his probation was "mediocre" due to inconsistent reporting and concerns about the accuracy of Father's address, as well as positive urinalysis. *Id.* at 17-20. Significantly, Father had a positive urinalysis in January 2017, and two positive urinalyses in October 2017, the last on October 16, 2017, resulting in his detainer.[13] *Id.* at 19, 22. As a result of the positive urinalysis, Father's probation was changed to additionally

---

[10] Robert Gaskill testified that Father was "not cooperative with any of [his] efforts to engage with him." N.T., 11/17/17, at 10.

[11] Naomi Watson characterized Father's cooperation with her as not consistent. *Id.* at 39.

[12] Father was additionally incarcerated for a period of thirty days in March 2016. *Id.* at 153.

[13] Father tested positive for methamphetamine, benzodiazepine, cocaine, THC, and oxycodone on October 10, 2017, and THC and oxycodone on October 16, 2017. *Id.* at 19, 22.

- 16 -

require a drug and alcohol evaluation and compliance with recommended treatment, which he had not completed. *Id.* at 20.

As this Court has stated, "a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006). Hence, the record substantiates the conclusion that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused the Children to be without essential parental control or subsistence necessary for their physical and mental well-being. *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Father cannot or will not remedy this situation. *See id.* As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b), and we, therefore, need not address any further subsections of Section 2511(a). *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M.*

- 17 -

*a/k/a L.C., Jr.]*, [533 Pa. 115, 123, 620 A.2d 481, 485 (1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 620 Pa. at 628-29, 71 A.3d at 267. "In cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008) (citation omitted).

When evaluating a parental bond, "[T]he court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d at 1121 (internal citations omitted).

Moreover,

While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent[.]

*In re Adoption of C.D.R.*, 111 A.3d at 1219 (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In the case *sub judice*, in determining that termination of Father's parental rights favors the Children's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated as follows:

> In the case before me, credible testimony clearly observes that there is no significant bond between the two youngest boys and birth parents. I understand the limited attachment that the eight-year-old, [H.H.-N.C.], has for his parents, but must weigh this attachment with my findings that the birth parents are incapable of having any reasonable prospects for reuniting the family. Given the emotional harm this child would incur by having the unreasonable hope of reunification, I find that he, along with his two younger brothers, will not be irreparably harmed by the termination of his birth parents' parental rights.
>
> Therefore, I find from the evidence and testimony that termination of the birth parents' rights best serves the needs and welfare of each child, and that termination of the parental rights of birth parents will not irreparably harm the children.

N.T., 12/1/17, at 20-21.

Upon review, the record supports the trial court's finding that the Children's developmental, physical, and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b). There was sufficient evidence to allow the trial court to make a determination of the Children's needs and welfare, as well as to the existence or lack of existence of a bond between Father and the Children such that, if severed, it would not have a detrimental impact on them.

Father has not seen the Children since court in July 2017. N.T., 11/17/17, at 89-90, 151. When asked about the connection between Father

and the Children, Nicole Hirschman, Salvation Army Children Services foster care caseworker, testified as follows:

> I would say mainly I could testify as to [H.H.-N.C.], being the oldest, that he does love his dad and he feels some loyalty for him. The younger two it was difficult to see what type of connection they had with him because they wanted to play with the toys or watch a movie, or have a snack. They were more concerned with other things.

*Id.* at 91. It was further noted that R.A.H.W. would have difficulty and not want to leave Foster Mother's side and cry at the start of visitations. *Id.* at 88. In addition, the Children would leave at the end of visitations to return to Foster Parents without issue and do not ask about Father. *Id.* at 134.

Additionally, Father initiated only four telephone calls in March and April 2017 in which he spoke with H.H.-N.C.[14] *Id.* at 60-61. Foster Father reported no calls since April. *Id.* Foster Father reported behavior following the calls where H.H.-N.C. would be "very angry and very resistant to any kind of leadership from -- any parenting from us as foster parents." *Id.* at 61. He noted such behaviors "greatly subsided" after telephone calls from Father ceased. *Id.* Similarly, Ms. Vazquez, while acknowledging a lack of consistent telephone calls, noted no cards, letters, or gifts from Father to the Children. *Id.* at 130.

---

[14] Foster Father indicated that Father spoke primarily with H.H.-N.C. because R.A.H.W. "does not communicate yet and [A.J.R.W.] is very, very difficult to understand on the phone, especially back in March and April when these phone calls happened." *Id.* at 60-61.

Likewise, the evidence reveals that Father was not supportive of recommended tongue-tie surgery for R.A.H.W. and A.J.R.W, which they were ultimately able to get as a result of a court order and has proven to be beneficial for them. *Id.* at 66-68, 131-33, 155-57.

Moreover, the Children have been placed together in their current pre-adoptive home since February 2017 and are doing well and their needs are being met. *Id.* at 133-34, 139. Ms. Hirschman, OCY caseworker, Jeanette Vazquez, and OCY adoption caseworker, Cathy Milliman, all offered testimony as to the positive interaction and bond between the Children and their foster family. *Id.* at 91, 133, 139. Significantly, Ms. Vazquez testified that the Children call Foster Parents "Mom and Dad," *id.* at 134, and characterized the relationship as a "happy relationship," *id.* at 139. Both Ms. Hirschman and Ms. Milliman described the interactions as affectionate. *Id.* at 91. Ms. Hirschman expressed that the Children "are all extremely affectionate with [Foster Parents] as well as their children, their biological children. And it appears that the connection is very positive every time I go to the home." *Id.* Similarly, Ms. Milliman stated:

> The children – my observation is that they are very comfortable in the home. They are not hesitant about approaching either of the parents or the older kids in the family. They are affectionate. The two little ones especially turn to the adults, you know, when something goes wrong, like what you would expect from a typical child who is being cared for.
>
> They were pretty engaged -- both parents were there both times and they were pretty engaged with the kids as are their older kids.

*Id.* at 162-63. Notably, in describing the difference in H.H.-N.C.'s behavior during visitation with Father as opposed to at home with foster family, Ms. Hirschman observed, "He seems during family visitation to be very quiet whereas in the foster home he is more apt to answer questions when I pull him aside to talk to him, play with his brothers, be more animated, and like I said, very affectionate with everybody." *Id.* at 91-92.

Foster Father further testified extensively as to his and his wife's involvement with the Children, including medically, educationally, and developmentally, and the progress the Children have made since being placed in the home. *Id.* at 51-59. As such, Ms. Vazquez expressed that it is OCY's recommendation that parental rights be terminated and that it is in the best interest of children to be adopted. *Id.* at 134, 140.

Thus, as confirmed by the record, termination of Father's parental rights serves the Children's developmental, physical, and emotional needs and welfare, and it was proper pursuant to Section 2511(b). While Father may profess to love the Children, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe

- 22 -

environment." ***In re B., N.M.***, 856 A.2d 847, 856 (Pa.Super. 2004) (citation omitted).

Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Father's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b).

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/29/18